**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
Matthew A. Girardi (*pro hac vice* forthcoming)
Julian C. Diamond (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail:  pfraietta@bursor.com
         aleslie@bursor.com
         mgirardi@bursor.com
         jdiamond@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.T., a minor, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SUPERCELL, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1    Plaintiff T.T., a minor (hereinafter "Plaintiff"), brings this action on behalf of himself and

2    all others similarly situated against Defendant Supercell, Inc. (hereinafter "Defendant" or

3    "Supercell").  Plaintiff makes the following allegations pursuant to the investigation of his counsel

4    and based upon information and belief, except as to the allegations specifically pertaining to

5    himself, which are based on personal knowledge.

6                                      **NATURE OF THE CASE**

7        1.    This is a putative class action brought by Plaintiff on behalf of himself and all others

8    similarly situated who disaffirm their entire contracts with Defendant and seek restitution in the

9    amount already paid to Defendant on their now-void contracts.  By filing this action, Plaintiff

10   hereby disaffirms his entire contract with Defendant.

11       2.    Plaintiff and the putative class have suffered injury due to deceptive and misleading

12   trade practices by Defendant in marketing and selling in-game items and in-game currency for its

13   popular video games, Clash of Clans, Clash Royale and Brawl Stars (collectively, the "Games").

14   These items and in-game currency are frequently purchased by minors who are unable to exercise

15   their unrestricted rights under state laws to rescind contracts into which they entered with

16   Defendant.

17       3.    The Games are ostensibly "free" to play.  However, the Games realize billions of

18   dollars in revenue, largely from children.

19       4.    The Games are monetized through a system where players can obtain new upgrades,

20   characters, chests, weapons, costumes, and other resources in exchange for virtual currency.  The

21   in-game currency can be purchased from Defendant using real money.

22       5.    Plaintiff brings this action for declaratory, equitable, and monetary relief under the

23   Declaratory Judgment Act, Business and Professions Code § 17200 *et seq.*, and/or for Unjust

24   Enrichment.

25                                   **JURISDICTION AND VENUE**

26       6.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act

27   ("CAFA"), 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of

28

CLASS ACTION COMPLAINT                                                                    1

the class is a citizen of a state different from any Defendant, the amount in controversy exceeds $5 million, exclusive of interest and costs, and the proposed class contains more than 100 members.

7.      This Court has personal jurisdiction over the Defendant because Defendant maintains its principal place of business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because Defendant maintains its principal place of business in this District.

<strong><u>PARTIES</u></strong>

9.      Plaintiff T.T. is a minor and a resident of California.  Plaintiff, on his own account and using his money, made multiple in-game purchases in Clash Royale.  Plaintiff no longer plays the Games and will not play the Games in the future.

10.     Defendant Supercell, Inc. is a Delaware corporation with a principal place of business located at 555 California St., Suite 5200, San Francisco, California, 94104. Supercell is a mobile video game development company whose video games include Brawl Stars, Clash of Clans, and Clash Royale.  Supercell transacts significant business within California and throughout the country.

<strong><u>GENERAL BACKGROUND</u></strong>

**A.    *The Games***

11.     Brawl Stars, Clash of Clans, and Clash Royale are video game platforms developed by Defendant.  While the games are somewhat distinct in gameplay, they feature identical contractual elements to the extent relevant for this case.

12.     The Games all break away from the traditional pay-for-game model, wherein a consumer pays a one-time fee for a game and gains access to all of its features. Supercell instead offers the Games for free with the hopes that players purchase various in-game items.  This is referred to as the "free-to-play" or "freemium" model.

13.     However, while the Games can ostensibly be played without making in-game purchases, the Games encourage impressionable minors to make in-game purchases.  This is

---

because many of the Games' most desirable in-game items and avatars can only be obtained by purchasing the items with virtual currency referred to as "Gems."  While Gems can be obtained (albeit slowly) through gameplay, obtaining Gems generally requires users to purchase them with real money.

14.     This system was created to capitalize on and encourage addictive behaviors.  Minors are especially susceptible to these addiction-forming elements of game design.  The experience of acquiring in-game items holds a strong appeal for minors and reinforces their desire to keep playing and continue making purchases.

15.     Members of Congress have expressed concern about nearly identical practices.  Specifically, in letters released to the public, Congresswoman Lori Trahan, Congresswoman Kathy Castor, and Senator Edward J. Markey have other similar video game makers to "make changes to [their] product or service's design or data collection" to address "Loot boxes … [that] encourage[e] purchase before a child knows what the 'bundle' contains— akin to gambling."  *See* Ex. A.

16.     Defendant's strategy has been immensely successful.  Supercell earned approximately $2,240,000,000 in 2021.[1]

17.     In pursuit of these massive profits and to the detriment of minor consumers, Defendant fails to provide an unrestricted right to seek refunds of any in-game purchases made by minors as is required by state law.

18.     Further, as detailed below, Plaintiff and the putative class's contracts for the purchase of virtual currency and/or virtual goods are void as a matter of law.

**B.     *Defendant's Misconduct***

19.     Defendant misleads or misrepresents the applicable law for transactions with minor, including in-game purchases.  Specifically, Defendant knows that in the state of California, and in most states nationwide, the law allows minors to disaffirm contracts.  Defendant also knows that a minor can disaffirm contracts without any restrictions because the law permits a minor to do so.  And finally, Defendant knows that contracts with minors for "personal property not in the immediate possession or control of the minor[s]" are void under CA FAM § 6701. Yet, Defendant

---

[1] https://supercell.com/en/news/best-days/7600/

operates a non-refund policy that misleads, misrepresents, and/or does not acknowledge a minor's right to obtain a refund.

20.     To the extent that Supercell requires that its Terms of Service be accepted by legal adults 18 years and older, Supercell still targets minors.  An agreement that explicitly requires acceptance by an adult cannot apply to a minor, and minors have a legal right to disaffirm contracts into which they enter.  And Supercell is aware a large portion of its player base is minors, and depending on the game, either allows players who have verified an age under 18 to make purchasers or does not verify ages at all.[2]

21.     The Supercell Terms of Service ("TOS") state that "[i]n the Service, you may purchase, with 'real world' money, a limited, personal, non-transferable, non-sublicensable, revocable right to use (a) virtual currency, including but not limited to virtual cash or diamonds, all for use in Supercell games …."[3]

22.     The TOS also state that "ALL PURCHASES AND REDEMPTIONS OF VIRTUAL ITEMS MADE THROUGH THE SERVICE ARE FINAL AND NON-REFUNDABLE" (emphasis in original).[4]

23.     Defendant maintains possession and control over Gems and whichever items that users purchase with their Gems.  Specifically, Defendant states "Supercell may manage, regulate, control, modify or eliminate Virtual Items at any time, with or without notice. Supercell shall have no liability to you or any third party in the event that Supercell exercises any such rights."[5]

24.     Gems can be purchased in the form of a digital code or a tangible card.

25.     Defendant additionally maintains possession and control of the purchases of Plaintiff and the Class by stating "Supercell owns, has licensed, or otherwise has rights to use all of the content that appears in the Service or in Supercell games. Notwithstanding any provision to the contrary herein, you agree that you have no right or title in or to any content that appears in the Service, including without limitation the virtual items, content, features, goods, services or

---

[2] https://supercell.com/en/.
[3] https://supercell.com/en/terms-of-service/.
[4] *Id.*
[5] *Id.*, *see* section 4.1.

currency appearing or originating in any Supercell game, whether earned in a game or purchased from Supercell, or any other attributes associated with an Account or stored on the Service."[6]

26.     Defendant also "reserves the right to stop offering and/or supporting the Service or a particular game or part of the Service at any time, at which point your right to use the Service or a part thereof will be automatically terminated."[7]

27.     Defendant thus contracts with Plaintiff and the class for "personal property not in the immediate possession or control of the minor[s]."  CA FAM § 6701.

28.     After making purchases within the Supercell ecosystem, minors who attempt to request refunds thus find that none of their purchases can be refunded.  Without hiring counsel, minor class members and their guardians are not aware of a minor's right to disaffirm and get refunds on in-game purchases.

## PLAINTIFF'S EXPERIENCE

29.     Before hiring counsel in this action, Plaintiff was not aware of a minor's right to disaffirm and request a refund.

30.     Within the last year Plaintiff made multiple in-game purchases of Gems in the Games, using his money.

31.     Despite spending money on in-game purchases, Plaintiff did not receive any items that had real value.  Plaintiff regrets these purchases and wishes to obtain a full refund.  Plaintiff no longer plays the Games and has no desire to resume playing the Games.

32.     After making his purchases, Plaintiff wanted to disaffirm them and request a refund. However, he was not able to do so under Supercell's refund policy, which states that "ALL PURCHASES AND REDEMPTIONS OF VIRTUAL ITEMS MADE THROUGH THE SERVICE ARE FINAL AND NON-REFUNDABLE" (emphasis in original).

33.     Once his parent retained counsel on his behalf to determine if his purchases could be recovered, Plaintiff and his parent read and reviewed the statement in the TOS that "[i]n the Service you may purchase, with 'real world' money, a limited, personal, non-transferable, non-

---

[6] *Id.*, *see* section 2.3.

[7] *Id.*, *see* section 1.2.

sublicensable, revocable right to use (a) virtual currency, including but not limited to virtual cash or diamonds, all for use in Supercell games," and that "[a]ll purchases and redemptions of virtual items made through the service are final and non-refundable."

34.     Had Defendant provided proper parental control and age verification features, Plaintiff would not have been able to make any of the purchases that he did.  Defendant could also implement features to allow minors to obtain refunds for purchases based on their unrestricted right to disaffirm contracts and/or based upon the fact that minors' purchases of Gems and virtual goods in the Games are void as a matter of law.

35.     Plaintiff relied on Defendant's representations regarding non-refundability for purchases.

36.     Plaintiff has felt dissatisfied with purchases that he made within the Games.

### CLASS ALLEGATIONS

37.     Plaintiff seeks to represent a class defined as:

> All persons in the United States who, at any time while under the age of 18, (a) exchanged in-game virtual currency for any in-game benefit within the Defendant's Games, or (b) made a purchase of virtual currency or other in-game benefit for use within the Defendant's Games.

38.     Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

39.     Plaintiff reserves the right to expand, limit, modify, or amend the class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based on, inter alia, changing circumstances and/or new facts obtained.

40.     **Numerosity**.  On information and belief, hundreds of thousands of consumers fall into the definitions of the Class.  Members of the Class can be identified through Defendant's

records, discovery, and other third-party sources.

41.     **Commonality and Predominance**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.  These common legal and factual questions include, but are not limited to, the following:

a.   Whether Defendant's failure to provide a method for minors or their guardians to disaffirm any purchases violated their consumer rights;

b.   Whether Plaintiff and the Class are able to disaffirm their contracts with Defendant and obtain a refund through the Declaratory Judgment Act;

c.   Whether Plaintiff's and the other Class members' contracts for the purchase of virtual currency and/or goods are void as a matter of law;

d.   Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

e.   Whether Plaintiff and the other Class members are entitled to restitution or other relief.

42.     **Typicality**.  Plaintiff's claims are typical of the claims of the other members of the Class in that, among other things, all Class members were similarly situated and were comparably injured through Defendant's wrongful conduct as set forth herein.  Further, there are no defenses available to Defendant that are unique to Plaintiff.

43.     **Adequacy of Representation**.  Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class.  Furthermore, Plaintiff has no interests that are antagonistic to those of the Class.

44.     **Superiority**.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would thus be virtually impossible for the Class to obtain effective redress for the wrongs committed against the members on an individual basis.  Furthermore, even if Class members could afford such individualized litigation, the court system

could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

45.     Further, Defendant has acted and refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final injunctive and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Declaratory Judgment on Minor's Right to Disaffirm**
**(On behalf of Plaintiff and the Class)**

46.     The foregoing allegations are hereby reincorporated by reference as if fully restated herein.

47.     Defendant's video games are approved for players of all ages. Defendant enters into and accepts a contract with a minor when an in-game purchase by the minor is confirmed, and thus accepted.

48.     There is consideration on both sides of this contract.  Supercell gives the consideration of digital content and entertainment service of the in-game purchases, exchanged for consideration of actual money from the minor.

49.     Under California law, and equivalent law in states nationwide, minors have the right to disaffirm contracts such as those at issue here.  Cal. Fam. Code § 6710 (2010).

50.     Minors may disaffirm or a guardian may disaffirm a contract on behalf of a minor within a reasonable amount of time of turning 18 years old.  Through the filing of this lawsuit, and thus by no later than the filing date of this lawsuit, Plaintiff disaffirmed all in-game purchases he has made through the Games to date and requested a refund.

51.     Plaintiff further seeks injunctive relief on behalf of the Class for future and prospective transactions on the Supercell video gaming platform and ecosystem to allow for refunds on all in-game purchases without restrictions.

52.     The contracts between Defendant and the members of the Class who are minors are voidable — a fact that Defendant denies as evidenced by its denial of the Class's right to be refunded in its Terms of Service.

53.     Accordingly, there is an actual controversy between the parties, requiring a declaratory judgment.

54.     Plaintiff has no adequate remedy at law for this claim.  There is no commensurate legal remedy for voidance of Plaintiff's contract and full restitution and interest thereon. Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also U.S. v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("the 'mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief"); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future").  Furthermore:

a.   To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

b.   Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have

grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

    c.   Legal claims for damages are not equally certain as restitution because claims under the CLRA, UCL and unjust enrichment entail few elements.

    d.   Plaintiff also lacks an adequate remedy at law to prevent future harm.

55.    This claim for declaratory judgment is brought pursuant to 28 U.S.C. § 2201 *et seq.*, seeking a determination by the Court that: (a) this action may proceed and be maintained as a class action; (b) the sales contracts between Defendant and Class members who are minors, relating to the purchase of in-game currency and virtual items, are voidable at the option of those Class members or their guardians; (c) if the Class members elect to void the contracts, they will be entitled to restitution and interest thereon; (d) an award of reasonable attorneys' fees and costs of suit to Plaintiff and the Class is appropriate; and such other and further relief as is necessary and just may be appropriate as well.

**<u>COUNT II</u>**
**Declaratory Judgment on a Minor's Inability to Contract For Personal Property**
**Not In Their Immediate Possession Or Control**
**(On behalf of Plaintiff and the Class)**

56.    The foregoing allegations are hereby reincorporated by reference as if fully restated herein.

57.    As described above, Defendant contracted with Plaintiff and the Class members, who are minors.

58.    Defendant's contracts with minor Plaintiff and class members include contracts for the purchase of Gems and virtual items.

59.    Gems can be purchased from Defendant in the form of tangible gift cards or intangible codes.

60.    California law recognizes both "intangible personal property" and "tangible personal property."  See, e.g., CA REV & TAX § 6011(10)(A)-(C); CA REV & TAX § 6016.

61.    According to California Law, a "minor cannot … [m]ake a contract relating to any personal property not in the immediate possession or control of the minor."  CA FAM § 6701.

62.     Both Gems and any virtual item sold to Plaintiff and Class members are personal property.

63.     According to Defendant's Terms of Service, Defendant explicitly maintains possession and/or control over the Gems and virtual items sold to Plaintiff and the Class Members as discussed supra.

64.     Thus, according to California law, the contracts for these purchases are void and Plaintiff and class members are entitled to a refund of the consideration paid under their contracts with Defendant.

65.     Defendant disputes that these contracts are void – as evidenced by the fact that Defendant's TOS claim that all purchases are non-refundable and the fact that Defendant does not maintain any mechanism for users who contracted with Defendant as minors to obtain refunds.

66.     Accordingly, there is an actual controversy between the parties, requiring a declaratory judgment.

67.     Plaintiff has no adequate remedy at law for this claim.  There is no commensurate legal remedy for full restitution and interest thereupon the void contract.  Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also U.S. v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("the 'mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief"); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future"). Furthermore:

    a.     To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it

determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

b. Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

c. Legal claims for damages are not equally certain as restitution because claims under the CLRA, UCL and unjust enrichment entail few elements.

68. Plaintiff also lacks an adequate remedy at law to prevent future harm.

69. This claim for declaratory judgment is brought pursuant to 28 U.S.C. § 2201 *et seq.*, seeking a determination by the Court that: (a) this action may proceed and be maintained as a class action; (b) the sales contracts between Defendant and Class members who are minors, relating to the purchase of in-game currency and virtual items, are void; (c) the Class members are entitled to restitution and interest thereon; (d) an award of reasonable attorneys' fees and costs of suit to Plaintiff and the Class is appropriate; and such other and further relief as is necessary and just may be appropriate as well.

### COUNT III
**Violation of the California Business & Professional Code § 17200**
**(On behalf of Plaintiff and the Class)**

70. The foregoing allegations are hereby reincorporated by reference as if fully restated herein.

71. Plaintiff and Class members have standing to pursue a cause of action against Defendant for unfair and/or unlawful business acts or practices because they have suffered an injury-in-fact and lost money due to Defendant's actions and/or omissions as set forth herein.

72. Defendant's conduct is unlawful under Bus. & Prof. Code § 17200 *et seq.* ("UCL") because it is in violation of a minor's absolute right to disaffirm contracts as discussed above.

73.     Defendant's conduct is also unlawful under the UCL because it is has collected monies paid for contracts void as a matter of law within the State of California and denied recovery of said monies.

74.     Defendant's conduct described herein is "unfair" under Bus. & Prof. Code § 17200 because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, and any utility of such practices is outweighed by the harm caused to consumers, including to Plaintiff, the Class, and the public.  Defendant engages in unfair practices by actively advertising, marketing, and promoting the Games as "free" with the intent to induce minors to purchase in-game currency and virtual items while illegally and unscrupulously denying minors any refunds they seek.

75.     In addition, Defendant's conduct constitutes a fraudulent business practice within the meaning of Bus. & Prof. Code § 17200, *et seq.*, in that Defendant intentionally and knowingly omitted giving information that refunds are allowed for minors without any restrictions under applicable law, and by explicitly representing that "**ALL PURCHASES AND REDEMPTIONS OF VIRTUAL ITEMS MADE THROUGH THE SERVICE ARE FINAL AND NON-REFUNDABLE.**"  Such representations and omissions misled Plaintiff and Class members and are likely to mislead the public.

76.     Defendant was aware that minors are a significant population of the individuals who play its games and that they are not capable of entering into binding contracts including for purchases of goods such that Defendant should have included parental control features and provided for an unrestricted right for minors and their guardians to seek refunds of any purchases made.

77.     Defendant, in light of its explicit representation to the contrary (*e.g.*, that purchases of virtual currency and in-game purchases were non-refundable) had a duty to make Plaintiff or the other members of the Class aware that they had an unrestricted right to refund any purchases, but did not do so.

78.     Defendant did not implement any features in its video games that would have allowed Plaintiff and Class members to seek a refund for their purchases.

79.     Plaintiff and putative Class members relied on Defendant's omission in that they were unaware that they could disaffirm their contract with Defendant and receive a refund and that their contracts with Defendant are void and they could receive a refund.

80.     Defendant knew or should have known that its representations regarding the in-game purchases were false, deceptive, and misleading.

81.     Defendant's conduct described herein constitutes an unfair business practice because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, and any utility of such practices is outweighed by the harm caused to consumers, including to Plaintiff, the Class, and the public.

82.     Defendant's wrongful conduct is ongoing, and part of a pattern or generalized course of conduct repeated on thousands if not millions of occasions yearly.

83.     As a direct and proximate cause of Defendant's deceptive and unfair trade practices, Plaintiff and the other members of the Class suffered actual damages, including monetary losses.

84.     Pursuant to Bus. & Prof. Code § 17203, Plaintiff seeks an injunction enjoining Defendant from continuing to engage in the conduct described above, or any other act prohibited by law.

85.     Plaintiff also seeks rescission and an order requiring Defendant to make full restitution, and to disgorge its ill-gotten gains wrongfully obtained from members of the Class as permitted by Bus. & Prof. Code § 17203.

86.     Additionally, Plaintiff and the Class members seek an order requiring Defendant to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

87.     Plaintiff has no adequate remedy at law for this claim.  There is no commensurate legal remedy for Plaintiff's requested relief under this count.  Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also U.S. v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("the 'mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief"); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the

jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future").  Furthermore:

    a.   To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

    b.   Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

    c.   Legal claims for damages are not equally certain as restitution because claims under the CLRA, UCL, and unjust enrichment entail few elements.

    d.   Plaintiff also lacks an adequate remedy at law to prevent future harm.

**COUNT IV**
**Restitution or Unjust Enrichment**
**In the Alternative**
**(On behalf of Plaintiff and the Class)**

88.    The foregoing allegations are hereby reincorporated by reference as if fully restated herein.

89.    Plaintiff and the other Class members conferred an economic benefit on Defendant through their in-game purchases and purchases of Gems.

90.    It is inequitable and unjust for Defendant to retain the revenue obtained from in-game purchases made by Plaintiff and the other Class members because, under principles of equity and good conscience, Defendant should not be permitted to retain the revenue it acquired through its unlawful conduct, i.e., with its non-refundable policy.  Defendant's conduct is unlawful because

it is in violation of the minor's right to disaffirm contracts, because the contracts entered into by Plaintiff and Class members were void as a matter of law yet Defendant still retains the monies paid, and because Defendant's conduct is fraudulent, unfair, and deceptive under the UCL, as discussed above.

91.    Defendant has misled and misinformed minors and their parents/guardians, i.e. Plaintiff and Class members.

92.    Accordingly, because Defendant will be unjustly enriched if it is allowed to retain such funds, Defendant must pay restitution to Plaintiff and the other Class members in the amount which Defendant was unjustly enriched by each of their purchases.

93.    Plaintiff has no adequate remedy at law for this claim.  Plaintiff pleads his claim for unjust enrichment in the alternative, which inherently would necessitate a finding of no adequate remedy at law.  Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also U.S. v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("the 'mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief"); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future").   Furthermore:

a.    To the extent damages are available here, damages are not equally certain as restitution because the standard that governs ordering restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

b.    Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles the plaintiff

to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Plaintiff seeks such relief here.

    c.   Legal claims for damages are not equally certain as restitution because claims under the CLRA, UCL, and unjust enrichment entail few elements.

    d.   A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law. Restatement (Third) of Restitution, § 4(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

    a.   For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative for the Class and Plaintiff's attorneys as Class Counsel;

    b.   For an order issuing a declaratory judgment that the sales contracts between Defendant and Plaintiff and the minor Class members are voidable;

    c.   For an order issuing a declaratory judgment that the sales contracts between Defendant and Plaintiff and the minor Class members are void;

    d.   For an order declaring that Defendant's conduct violates the laws referenced herein;

    e.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

    f.   For prejudgment interest on all amounts awarded;

    g.   For an order of restitution and all other forms of equitable monetary relief;

    h.   For injunctive relief as the Court may deem proper; and

    i.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  June 1, 2022

**BURSOR & FISHER, P.A**.

By:     /s/ *L. Timothy Fisher*
                L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
Matthew A. Girardi (*pro hac vice* forthcoming)
Julian C. Diamond (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail:  pfraietta@bursor.com
              aleslie@bursor.com
              mgirardi@bursor.com
              jdiamond@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT A**

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. Robert Kotick
Chief Executive Officer
Activision Blizzard Inc.
3100 Ocean Park Boulevard
Santa Monica, CA 90405

Dear Mr. Kotick:

We are writing to inquire about Activision Blizzard's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient. [4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or disclosure of children's personal information without notice to parents and parental consent.[6]

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf

[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf

[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills

[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf

[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks

[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

Mr. Kotick
August 10, 2021
Page 2

However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,

Lori Trahan                        Kathy Castor                        Edward J. Markey
Member of Congress                 Member of Congress                  United States Senator

---

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).

[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.

[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. Robert Chapek
Chief Executive Officer
The Walt Disney Company
500 S Buena Vista St
Burbank, CA 91521

Dear Mr. Chapek:

We are writing to inquire about Disney's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or disclosure of children's personal information without notice to parents and parental consent.[6]

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf
[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf
[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills
[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf
[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks
[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

Mr. Chapek
August 10, 2021
Page 2

However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,


Lori Trahan                              Kathy Castor                          Edward J. Markey
Member of Congress              Member of Congress              United States Senator

---

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).
[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.
[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. Tim Sweeney
Chief Executive Officer & Founder
Epic Games Inc.
620 Crossroads Blvd
Cary, NC 27518

Dear Mr. Sweeney:

We are writing to inquire about Epic's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or disclosure of children's personal information without notice to parents and parental consent.[6]

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf
[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf
[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills
[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf
[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks
[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

Mr. Sweeney
August 10, 2021
Page 2

However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,

Lori Trahan                           Kathy Castor                         Edward J. Markey
Member of Congress              Member of Congress             United States Senator

---

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).
[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.
[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. Satya Nadella                 Mr. Phil Spencer
Chief Executive Officer           Executive President of Gaming at Microsoft
Microsoft                         Xbox Game Studios
One Microsoft Way                 3640 150th NE
Redmond, WA, 98052                Redmond, WA, 98052


Dear Mr. Nadella & Mr. Spencer:

We are writing to inquire about Microsoft's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf

[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf

[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills

[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf

[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks

Mr. Nadella & Mr. Spencer
August 10, 2021
Page 2

disclosure of children's personal information without notice to parents and parental consent.[6] However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online. Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,

Lori Trahan                     Kathy Castor                     Edward J. Markey
Member of Congress              Member of Congress               United States Senator

---

[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).

[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.

[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. John Hanke
Chief Executive Officer & Co-founder
Niantic
1 Ferry Building, Suite 200
San Francisco, CA 94111

Dear Mr. Hanke:

We are writing to inquire about Niantic's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or disclosure of children's personal information without notice to parents and parental consent.[6]

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf
[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf
[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills
[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf
[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks
[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

Mr. Hanke
August 10, 2021
Page 2

However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,

Lori Trahan                       Kathy Castor                       Edward J. Markey
Member of Congress                Member of Congress                 United States Senator

---

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).
[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.
[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. Shuntaro Furukawa
President/Representative Director
Nintendo Co Ltd
4600 150th Avenue, NE
Redmond, WA 98052

Dear Mr. Furukawa:

We are writing to inquire about Nintendo's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or disclosure of children's personal information without notice to parents and parental consent.[6]

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf
[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf
[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills
[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf
[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks
[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

Mr. Furukawa
August 10, 2021
Page 2

However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,


Lori Trahan                     Kathy Castor                     Edward J. Markey
Member of Congress              Member of Congress               United States Senator

---

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).

[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.

[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. Nicolo Laurent
Chief Executive Officer
Riot Games Inc
2450 Broadway Suite 100
Santa Monica, CA 90404

Dear Mr. Laurent,

We are writing to inquire about Riot Games' intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf

[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf

[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills

[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf

[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks

Mr. Laurent
August 10, 2021
Page 2

disclosure of children's personal information without notice to parents and parental consent.[6] However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,

Lori Trahan                         Kathy Castor                        Edward J. Markey
Member of Congress          Member of Congress          United States Senator

---

[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).

[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.

[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. David Baszucki
Chief Executive Officer & Co-Founder
Roblox Corp
970 Park Pl
San Mateo, CA 94403

Dear Mr. Baszucki:

We are writing to inquire about Roblox's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or disclosure of children's personal information without notice to parents and parental consent.[6]

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf

[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf

[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills

[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf

[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks

[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

Mr. Baszucki
August 10, 2021
Page 2

However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1.  Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2.  Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,

Lori Trahan                      Kathy Castor                    Edward J. Markey
Member of Congress               Member of Congress              United States Senator

---

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).

[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.

[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. Michael Lynton
Chief Executive Officer
Sony Corporation of America
25 Madison Avenue
New York, NY, 10010

Dear Mr. Lynton:

We are writing to inquire about Sony's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or disclosure of children's personal information without notice to parents and parental consent.[6]

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf

[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf

[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills

[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf

[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks

[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

Mr. Lynton
August 10, 2021
Page 2

However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,


Lori Trahan                       Kathy Castor                      Edward J. Markey
Member of Congress          Member of Congress         United States Senator


---

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).
[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.
[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. Max Rangel
Director, Global President & CEO
Spin Master
5880 West Jefferson Blvd Suite A
Los Angeles, CA 90016

Dear Mr. Rangel:

We are writing to inquire about Spin Master's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or disclosure of children's personal information without notice to parents and parental consent.[6]

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf

[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf

[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills

[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf

[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks

[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

Mr. Rangel
August 10, 2021
Page 2

However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,

Lori Trahan                          Kathy Castor                          Edward J. Markey
Member of Congress         Member of Congress           United States Senator

---

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).
[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.
[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Mr. Strauss Zelnick
Chairman & Chief Executive Officer
Take-Two Interactive Software Inc
622 Broadway
New York, NY 10012

Dear Mr. Zelnick:

We are writing to inquire about Take-Two Interactive's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or disclosure of children's personal information without notice to parents and parental consent.[6]

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf

[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf

[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills

[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf

[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks

[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

Mr. Zelnick
August 10, 2021
Page 2

However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,


Lori Trahan                          Kathy Castor                         Edward J. Markey
Member of Congress          Member of Congress          United States Senator

---

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).
[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.
[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.

# Congress of the United States
## Washington, DC 20515

August 10, 2021

Ms. Ann Sarnoff
Chief Executive Officer
Warner Bros Entertainment Inc
4000 Warner Blvd
Burbank, CA 91522

Dear Ms. Sarnoff,

We are writing to inquire about Warner Bros Entertainment's intentions to comply with the United Kingdom's (UK) Age Appropriate Design Code (AADC) within the United States. 70% of families have at least one child who plays video games.[1] While online gaming can benefit children, risks range from the collection and monetization of children's data, exposure to violent content, online predators, and manipulative design.[2]

The prevalence of micro-transactions—often encouraged through nudging— have led to high credit card bills for parents. Loot boxes go one step further, encouraging purchase before a child knows what the "bundle" contains— akin to gambling.[3] Children are uniquely vulnerable to manipulation and peer pressure associated with in-game purchases and loot boxes. Experts suggest that Entertainment Software Rating Board (ESRB) ratings and parental controls are insufficient.[4] The AADC represents a monumental step towards child centric design by default.

Additionally, the social interactions in online gaming allow cyber criminals to manipulate conversations and garner detailed personal information.[5] In light of these threats, children and teens deserve strong online privacy safeguards. Currently, the Children's Online Privacy Protection Act (COPPA) covers children aged 12 and under and prohibits the collection, use, or

---

[1] Entertainment Software Association, *2019 Essential Facts About the Computer and Video Game Industry* (May 2009), https://www.theesa.com/wp-content/uploads/2019/05/2019-Essential-Facts-About-the-Computer-and-Video-Game-Industry.pdf
[2] Unicef, *Child Rights and Online Gaming: Opportunities & Challenges for Children and the Industry* (August, 2019), https://www.unicef-irc.org/files/upload/documents/UNICEF_CRBDigitalWorldSeriesOnline_Gaming.pdf
[3] Jo Thornhill, *With Children off School and Gaming Online, Parents face Shock Bills*, The Guardian (April 5, 2020), https://www.theguardian.com/money/2020/apr/05/with-children-off-school-and-gaming-online-parents-face-shock-bills
[4] FTC Staff Perspective, *FTC Video Game Loot Box Workshop* (August, 2020) pg 3, https://www.ftc.gov/system/files/documents/reports/staff-perspective-paper-loot-box-workshop/loot_box_workshop_staff_perspective.pdf
[5] Eric J. Hayes, *Playing it Safe: Avoiding Online Gaming Risks*, US CERT (February 6, 2014) https://us-cert.cisa.gov/security-publications/playing-it-safe-avoiding-online-gaming-risks

Ms. Sarnoff
August 10, 2021
Page 2

disclosure of children's personal information without notice to parents and parental consent.[6] However, young internet users deserve a new set of requirements and prohibitions that builds on COPPA. Signers of this letter have proposed legislation to extend privacy protections to teens, amend COPPA to cover websites that should reasonably know that kids are on their platforms, and create new data minimization standards to stop websites from amassing troves of information about kids and teens.[7]

The AADC, created under s.123 of the UK Data Protection Act 2018 required the UK Information Commissioner's Office (ICO) to draft and implement The Children's Code. The standards will apply to "information society services" which are likely to be accessed by children, under 18, in the UK, regardless of where the company is headquartered. The Code seeks to empower children and, given that a child could be 7 or 17, the protections vary by age range. The Code includes 15 flexible standards that provide protections for children to learn and grow online.  Standards range from privacy by default and data minimization to limits on "nudge techniques" and transparency standards.[8] Organizations that operate in the UK are expected to comply with The Age Appropriate Design Code beginning on September 2, 2021, and companies have already begun to announce privacy policy changes that appear to be driven by efforts to comply with AADC.[9]

It is imperative that Congress acts with urgency to enact a strong privacy law for children and teens in the 21st century. As we work towards that goal, we urge you to extend to American children and teens any privacy enhancements that you implement to comply with the AADC. We also request responses to the following questions by August 26, 2021.

1. Do you intend to make changes to your product or service's design or data collection and use to comply with the UK Age Appropriate Design Code?
2. Will you implement these changes for users in the United States? If not, why not? If yes, will these changes be reflected on a public-facing website or in your terms of service?

Thank you for your attention to these important matters.

Sincerely,

Lori Trahan                          Kathy Castor                          Edward J. Markey
Member of Congress              Member of Congress              United States Senator

---

[6] COPPA FAQs, A, https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-askedquestions. These prohibitions cover any company that has "actual knowledge that it is collecting personal information from a child." 15 U.S.C. § 6502(a)(1)

[7] Children and Teens' Online Privacy Protection Act of 2021, S. 1628, 117th Cong. (2021) (Senator Markey); PRIVCY Act, H.R. 5703, 116th Cong. (2020) (Representative Castor).

[8] U.K. Information Commissioner's Office, *Age Appropriate Design: A Code of Practice for Online Services* (Sept. 2, 2020), https://ico.org.uk/media/for-organisations/guide-to-data-protection/key-data-protection-themes/age-appropriate-design-a-code-of-practice-for-online-services-2-1.pdf.

[9] Facebook, *Giving Young People a Safer, More Private Experience on Instagram* (July 2021), https://about.fb.com/news/2021/07/instagram-safe-and-private-for-young-people/.